IN THE MATTER OF THE APPLICATION OF COMBUSTION EQUIPMENT ASSOCIATES, INC. PURSUANT TO *N. J. S. A.* 13:1E–1 *ET SEQ.* FOR A REGISTRATION OF A SOLID WASTE RESOURCE FACILITY.

ESSEX COUNTY IMPROVEMENT AUTHORITY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, APPELLANT, v. COMBUSTION EQUIPMENT ASSOCIATES, A NEW YORK CORPORATION, RESPONDENT, AND DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT, AND CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, INTERVENOR-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued June 12, 1979—Decided June 26, 1979.

Before Judges LYNCH, CRANE and HORN.

Mr. *Michael R. Perle* argued the cause for appellant.

Mr. *Kevin J. Coakley* argued the cause for respondent Combustion Equipment Associates (*Messrs. Connell, Foley & Geiser,* attorneys; Mr. *Adrian M. Foley, Jr.,* of counsel).

Mr. *Nathan M. Edelstein,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (*Mr. John J. Degnan,* Attorney General, attorney; Ms. *Erminie Conley,* Assistant Attorney General, of counsel).

*Mr. Melvin Simon* argued the cause for intervenor-respondent (*Mr. Salvatore Perillo,* attorney).

The opinion of the court was delivered by

HORN, J. A. D. This appeal calls upon us to interpret the Solid Waste Management Act (act), *N. J. S. A.* 13:1E–1 *et seq.,* within the context of delineating the contours of the jurisdiction and powers of counties as opposed to the State Department of Environmental Protection (Department) with respect to authorization to construct new solid waste facilities. An earlier confrontation between the parties is recorded in *Essex Cty. Bd. of Chosen Freeholders v. O'Hern,* 161 *N. J. Super.* 274 (Law Div. 1978). And, although the issues before us are related to those which arose in that case, they are not the same. We are of the view, however, that there is sufficient similarity between the issues to impel us to state that, although we disagree with some of the declarations made by the trial judge in that case, we are, of course, not bound by same, and such of them as are in conflict with our own stated concepts are overruled.

Specifically, appellant Essex County Improvement Authority (ECIA) challenges the action of the Department as *ultra vires* in awarding a "Certificate of Approved Registration" to respondent Combustion Equipment Associates, Inc. (CEA) for the establishment and construction of a solid waste disposal and resource recovery facility in the City of Newark. ECIA is the agency designated by the County of Essex, through its board of freeholders, to develop a solid waste management system for the county. Accordingly, its standing in this case is for all intents and purposes synonymous with that of the county.

Essex County, the largest county in New Jersey, generates approximately 3,000 tons of solid waste a day. Newark, which has nearly 40% of the county's population, generates about 23% to 25% of the county's solid waste. Because of the imminent closings of landfills in Newark and the Hackensack

Meadowlands, Newark decided in the early 1970s to undertake a program for improved solid waste disposal to protect its own interests.

On September 26, 1976 Newark received competitive public bids for a long-term solid waste disposal contract. In June 1977 Newark and CEA entered into a 20-year disposal and recycling contract. On August 16, 1978, after a series of hearings, the Department issued the Certificate of Registration for the CEA facility.

ECIA specifically objects to the registration certificate insofar as it is "permanent," as opposed to a "temporary" registration which would expire when ECIA had obtained approval of a District Solid Waste Management Plan for the County of Essex. ECIA also complains that the registration certificate does not include any limitation upon the size of the resource recovery facility based upon the anticipated volume of municipal solid waste of the City of Newark.

The basic question on this appeal is whether the approval given by the Department to a resource facility for the disposal and recycling of solid waste material generated by the City of Newark improperly interferes with the county-wide planning scheme of the act. The Department and ECIA differ as to whether the Department has the authority to register a municipal waste disposal system which arguably could conflict with a future county-wide solid waste disposal system.

The act, adopted in 1970[1], was amended significantly in 1975 to provide new procedures to promote regionalism of solid waste disposal. The amended statute contained legislative findings that "the management of solid waste in New Jersey consists largely of piecemeal, uncoordinated activities developed to meet the immediate needs of local governments with little, if any, regard for regional planning and coordina-

---

[1] It is noteworthy that § 2 of the 1970 statute referred to "the current solid waste crisis."

tion * * *." *N. J. S. A.* 13:1E-2(a). Therefore it declared it to be the "policy of this State to (1) Establish a statutory framework within which all solid waste collection, disposal and utilization activity in this State may be coordinated * * *." *N. J. S. A.* 13:1E-2(b).

The vehicle chosen by the State to implement regional solid waste planning was the county. Each county (and the Hackensack Meadowlands Development Commission) (22 districts) was vested with:

* * * the power, singly or jointly with one or more other districts, to develop and implement a comprehensive solid waste management plan which meets the needs of every municipality within each such county and within the Hackensack Meadowlands District; * * *. [*N. J. S. A.* 13:1E-2(b)(2)]

Pursuant to the act, the counties in the State were divided into three groups and given various deadlines for various planning stages in their development of a district plan. The deadline for Department consideration of the Essex County disposal plan is September 22, 1979 (*N. J. A. C.* 7:26-1.10).

The Department was also given substantial powers to develop and update a statewide solid waste management plan, *N. J. S. A.* 13:1E-6(a)(3), and to approve, modify or reject any district solid waste management plan, *N. J. S. A.* 13:1E-24. The role of the Department in the establishment of a statewide solid waste management plan is most clearly set forth in *N. J. S. A.* 13:1E-2(b)(6). Thereby the policy of the State was declared to be to

Establish a meaningful and responsible role for the State in the solution of solid waste problems by granting the Department of Environmental Protection and the Solid Waste Advisory Council the power, not only to regulate and supervise all solid waste collection and disposal facilities and operations and to register all persons engaged in the collection or disposal of solid waste in this State, but also to develop through a Statewide solid waste management plan objectives, criteria and procedures to assure the orderly preparation and evaluation of the solid waste management plans developed by every solid waste management district, and to approve, modify, or

reject such solid waste management plans on the basis of their conformity with such objectives, criteria and procedures, to develop and implement such a plan where none is approved or forthcoming from any solid waste management district, * * *.

■ Thus, the statutory scheme maps out a symbiotic relationship for the Department and the various county planning districts: the Department is to establish a statewide plan for solid waste management and the county agencies are to establish regional plans. The Department is also given by statute the authority to monitor the county agencies and to fill any gap caused by a county's inaction or noncompliance with the Department's statewide scheme.

ECIA claims that in the present case the Department has overstepped its statutory authority. It contends that the registration by the Department of the CEA facility was *ultra vires* because it was not in keeping with its concept of the statutory scheme.

*N. J. S. A.* 13:1E–4(b) is the core of the present controversy between the ECIA and the Department. As originally introduced in the State Senate that section provided:

The department in reviewing the registration statement for a new solid waste collection operation or solid waste disposal facility or operation and in determining the conditions under which it may be approved, shall [give due consideration to community development or comprehensive regional solid waste collection and disposal in order to be assured, insofar as is practicable, that all proposed facilities, installations and operation shall conform to reasonably contemplated development of comprehensive community or regional solid waste collection and disposal facilities and operations and to any Statewide, regional, county and intercounty plans for solid waste management] *not approve the registration of any new operation or facility that does not conform to the solid waste management plan of the solid waste management district in which such operation or facility is to be located, as such plan shall have been approved by the department as hereinafter provided. Prior to the approval by the department of the solid waste management plan of any solid waste management district, the department may grant only conditional approval to any new solid waste collection or disposal operation or facility planned to be located in any such district. Such conditional approval shall be valid for a period of 1 year, or until the solid waste management*

*plan shall have been approved by the department, whichever comes
sooner, at which time such conditional approval shall expire and
any such conditionally approved solid waste collection or disposal
operation or facility shall be required to register with the depart-
ment under the same conditions as a new solid waste collection or
disposal operation or facility; provided, however, that nothing herein
contained shall be construed as exempting any conditionally approved
solid waste collection or disposal operation or facility from any
codes, rules and regulations of the department concerning solid
waste collection and solid waste disposal activities. The fee for such
conditional approval shall be the appropriate fee established in Section
5 of which this act is amendatory and supplementary, notwithstand-
ing the length of time for which it is applicable.* [Amendatory lan-
guage italic; brackets indicate deletion]

That restrictive statutory language (which limited the De-
partment's power to approve a new solid waste collection or
disposal system to a one-year period) was modified con-
siderably before final passage. As finally enacted, *N. J. S. A.*
13:1E–4(b) reads:

The department in reviewing the registration statement for a new
solid waste collection operation or solid waste disposal facility or
operation or in determining the conditions under which it may be
approved shall *not approve the registration of any new operation
or facility that does not conform to the solid waste management plan
of the solid waste management district in which such operation or
facility is to be located, as such plan shall have been approved by
the department as hereinafter provided. Prior to the approval by
the department of the solid waste management plan of any solid
waste management district, the department may grant approval to
any new solid waste collection or disposal operation or facility
planned to be located in any such district and that district shall in-
clude said operation or facility in its plan.* [Amendatory language
italic]

The act was passed by the Senate on June 23, 1975. It was
passed with amendments in the Assembly on January 5,
1976. The Senate passed the act, as amended, on January 8,
1976. All respondents, including intervenor-respondent City
of Newark, argue that the act, as amended, clearly provides
the Department with power to grant final and permanent
registrations during the period of district (county) planning.

On the other hand, the ECIA asserts that § 4(b) should not be seen as in any way undercutting the primary and exclusive role the counties have in developing and implementing district plans without interference from the Department; the function of § 4(b), according to the ECIA, is to allow the Department to temporarily register facilities, but only in conformity with the to-be-developed county plan.

This argument of the ECIA apparently found favor with the trial judge in the case which we have already noted. He held that § 4(b) only gave the Department limited and "strictly circumscribed power" to approve waste disposal facilities outside the county plan. 161 *N. J. Super.* at 283. In fact, the judge's analysis of the statutory scheme led him to the conclusion that during the county's planning stages for a waste disposal system the county has

* * * exclusive jurisdiction for the planning of solid waste disposal in [its] district. During the planning stage, however, the Department has the authority, as limited by the act, to register waste disposal facilities to *temporarily* meet the needs of the district. [161 *N. J. Super.* at 283-284; emphasis supplied]

Thus, the Department and the ECIA have fundamental differences in their views on how the legislative scheme for solid waste management should work. The ECIA argues that the role of the DEP in licensing new solid waste facilities is strictly limited and should be viewed more as a temporary stop-gap awaiting a final county plan. The Department contends that it can give final, permanent registration to a project such as the CEA's, and that the county must include that project in its final solid waste management plan.

Although the interpretive gap between the litigants is wide, the practical consequences of their views may be quite closer. The ECIA is quite concerned that while Newark generates only approximately 700 to 750 tons of solid waste a day, it has been authorized by the Department to construct a facility of up to 3,000 tons capacity. The ECIA views that excess capacity with much suspicion. It states in its brief:

There can be no doubt from a reading of the Act that [the Department's] approach to the CEA-Newark proposal, *particularly in not limiting its size to Newark's needs*, runs counter to the intention of both the original law and the Act. The legislative history of the Act [*L.* 1975, *c.* 326], including the remarks of its chief sponsor and the testimony of the DEP in favor of the legislation, shows it was designed to combat precisely the mischief involved in the Newark-CEA proposal, that is, the possibility that a municipality or a private concern could strike out on its own and thereby destroy the "potential efficacy" of a regional approach. [Emphasis supplied]

The ECIA in the passage above raises the spectre that the CEA and Newark are trying to make an end-run around county planning. By building a plant much larger than necessary for Newark's capacity, the ECIA argues, the CEA will present the county with a *fail accompli* in terms of a plant large enough to accommodate Essex County's waste disposal needs without receiving proper county approval.

The Department claims that the ECIA "misconceives the alleged impact of the registration on district planning." It contends:

\* \* \* Only the wastes generated by Newark are to go to CEA, with the anticipated volume to be 750 tons per day. The remaining capacity at CEA can only be used to process wastes generated outside the district, and appellant clearly need not be concerned with planning for such foreign wastes.

The registration certificate issued by the Department to the CEA supports the Department's argument that that registration is limited in scope. Under the heading "District Solid Waste Management Plan" it states:

With respect to the provisions of *N. J. S. A.* 13:1E-4b, the Essex County District Solid Waste Management Plan shall include this facility, and designate to this facility those wastes to be received pursuant to a contract between Combustion Equipment Associates, Inc. and the City of Newark approved by the Department of Environmental Protection on May 17, 1977. *No solid wastes from Essex County, other than those included in said contract shall received at this facility, if the receipt of such wastes conflicts with the adopted and approved District Solid Waste Management Plan required under N. J. S. A.* 13:1E-1. [Emphasis supplied]

The Department states in its brief, in recognition of the stated registration restriction:

\* \* \* Instead, as regards wastes generated within Essex County, the CEA capacity is expressly limited to the wastes generated in Newark, with a maximum permitted volume of 2,000 tons per day. Appellant is free to plan for all remaining wastes generated within the district and appellant can thus fully discharge its planning efforts.

We conclude that the Department and the districts (including their respective agencies, like the ECIA) have overlapping jurisdiction over solid waste management planning. In order to avoid the "piecemeal" planning of the past, the State, by way of the Solid Waste Management Act, has designated the Department as the statewide solid waste planning agency and has authorized the counties to administer regional solid waste planning. However, the Department also has the responsibility to oversee and approve or reject the various county plans.

But under the authority of *N. J. S. A.* 13:1E–4(b), as finally adopted, the Department is vested with discretionary authority to license solid waste facilities before the passage of a county plan, and thereafter each county within which such a licensed facility is authorized "shall include" that licensed facility in its plan. The act does not limit the licensing ability of the Department to the period before a county plan is adopted. There appears to be nothing in the entire act which we perceive has such effect. To the contrary, it makes economic sense for the Department to be able to permanently license a facility such as CEA's, rather than to grant a license which could expire the moment the county finished its planning.

We note also the argument of the ECIA that § 4(b) of the act must be read in conjunction with *N. J. S. A.* 13:1E–26(a) to assess the validity of Department licensing of any putative disposal facility. The latter section states that Department approval of a solid waste facility shall be granted only if

The proposed construction, acquisition, or operation is consistent with the adopted and approved or promulgated solid waste management plan of the solid waste management district within which the solid waste facility is to be located * * *.

The ECIA contends that § 13:1E–26(a) compels the conclusion that any new solid waste management facility in Essex County must be subject to a threshold determination of whether the facility is consistent with the developing county plan. CEA submits that § 26(a) should not be read to freeze the registration of new solid waste facilities during the planning process.

The approval of the CEA facility was obtained well before the countywide plan was due under the Departmental guidelines. In the view of the act that we have taken we are satisfied that *N. J. S. A.* 13:1E–26(a), especially when read in conjunction with *N. J. S. A.* 13:1E–4(b), gives the Department the authority to license a solid waste management facility even before the county completes its solid waste management plan.

While we agree with the ECIA that the county was supposed to be the focal point of solid waste planning under the 1975 Solid Waste Management Act, its interpretation of the act would seriously impede the ability of the Department in trying to solve solid waste disposal problems which occur before county planning is completed. As argued by the Department, if the ECIA's contentions are correct, the Department would be helpless to implement solid waste management and environmentally sound waste disposal plans in those counties whose planning for a countywide system is even less developed than that of Essex County.

Although not forcefully argued, the ECIA does assert that even if the Department had the statutory authority, which we have now found to exist, to license the CEA-Newark facility, nonetheless its exercise under the circumstances constituted an arbitrary and capricious abuse of its discretion. We disagree.

It appears clear to us that the Legislature intended to vest in the Department great supervisory powers over the critical and urgent need for solid waste disposal. It intended that the expertise of the Department should be utilized in its entrusted functions. Our review of the record evidences a sound basis for the action of the Department. *Mayflower Securities Co. v. Bureau of Securities,* 64 *N. J.* 85 (1973); *Close v. Kordulak Bros.,* 44 *N. J.* 589 (1965).

We have carefully considered all other contentions advanced by the parties, but in view of our holding find it unnecessary to discuss them. For the foregoing reasons, the challenged action of the Department is affirmed.